# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ALVIN RAMIREZ and SHANNON
RAMIREZ,

      Plaintiffs,

vs.                                                                                    No. CIV 22-0148 JB/GJF

BOARD OF COUNTY COMMISSIONERS
OF SIERRA COUNTY; NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY;
DEPUTY JACOB JONES, in his individual and
official capacities; OFFICER MALIK ALI, in
his individual and official capacities, and JOEL
TREJO, in his individual and official capacities,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Opposed Motion for and Memorandum in Support of Partial Summary Judgment Against Defendants Jacob Jones and Malik Ali on Unreasonable Seizure and Excessive Force Claims, filed August 14, 2023 (Doc. 54)("A. Ramirez MSJ");[1] (ii) Officer Malik Ali's Motion for Summary Judgment on the Basis of Qualified Immunity and for Failure to Provide Factual Support for Plaintiffs' Their Claims [sic] and Memorandum in Support, filed October 18, 2023 (Doc. 69)("Ali MSJ"); and (iii) the Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity and on Other

---

[1]On March 25, 2024, the Court entered an Order denying the Plaintiff's Opposed Motion for and Memorandum in Support of Partial Summary Judgment Against Defendants Jacob Jones and Malik Ali on Unreasonable Seizure and Excessive Force Claims, filed August 14, 2023 (Doc. 54).  See Order at 1-2, March 25, 2024 (Doc. 89)("Order").  In the Order, the Court stated that it would "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

Grounds and Memorandum in Support, filed October 19, 2023 (Doc. 72)("Jones MSJ").   The

Court held a hearing on November 21, 2023.   See Clerk's Minutes, filed November 21, 2023

(Doc. 83).   The primary issues are: (i) whether a triable issue of fact remains whether Defendants

Jacob Jones and Malik Ali violated Plaintiffs Alvin Ramirez and Shannon Ramirez' rights under

the Fourth Amendment to the Constitution of the United States of America to be free from

unreasonable seizure and to be free from excessive force; and (ii) whether Defendants Jones and

Ali are entitled to qualified immunity.   The Court concludes that: (i) no triable factual issue exists

whether Defendants Jones and Ali violated the Plaintiffs' rights under the Fourth Amendment,

because the record demonstrates indisputably that Jones and Ali's conduct did not violate A.

Ramirez or S. Ramirez' Fourth Amendment rights; and (ii)  Jones and Ali are entitled to qualified

immunity.   Accordingly, the Court denies the A. Ramirez MSJ, grants the Ali MSJ, and grants the

Jones MSJ.   Because these motions' dispositions are dispositive of the Ramirezes' action, the

Court will enter Final Judgment.

## **FACTUAL BACKGROUND**

A. Ramirez and S. Ramirez' lawsuit arises from their encounter with Jones and Ali, law

enforcement officers who responded to a 911 call about A. Ramirez' conduct at the Ramirez

homestead.   The Court draws its facts from the A. Ramirez MSJ, from Ali and Jones' responses to

the A. Ramirez MSJ, and from the Ali MSJ and the Jones MSJ.[2]   See Defendant Jones' Response

---

[2]A. Ramirez and S. Ramirez do not respond to either the Jones MSJ or to the Ali MSJ; the Federal Rules of Civil Procedure and local rules authorize the Court to deem undisputed all asserted material facts that a nonmovant does not specifically dispute, see Fed. R. Civ. P. 56(e)(2) ("Failing to Properly Support or Address a Fact.  If a party . . . fails to properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion . . . ."); D.N.M. LCvR 56.1(b) ("The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. . . . All material facts set forth in the Memorandum will be deemed undisputed unless

to Plaintiff's Partial Motion for Summary Judgment, filed August 28, 2023 (Doc. 58)("Jones Response"); Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed August 28, 2023 (Doc. 59)("Ali Response").  The Court also draws on record materials, including

---

specifically controverted.").  Because the Plaintiffs do not respond to the Defendants' MSJ, the federal rules authorize the Court to deem undisputed the Jones MSJ and Ali MSJ's material facts.
    The Ramirezes maintain, however, that the Defendants' motions are not unopposed.  At the hearing, the Ramirezes acknowledged that they should have responded to the two Defendants' motions for summary judgment.  They requested, however, that the Court treat their own A. Ramirez MSJ functionally as a response to the Defendants' motions for summary judgment:

> THE COURT:          I'm not seeing any response to [Ali's MSJ,] motion number 69.

> MS. WILLIAMS:       There is no response filed, Your Honor.

> THE COURT:          So is that unopposed, Mr. Cardenas, document number 69?

> . . . .

> MR. CARDENAS:       [T]here is not a response, Your Honor, and I apologize about that, but I would ask the Court to take my motion and reapply [it,] as the briefing, as it would have briefed the exact same issues.

Tr. at 5:16-6:6 (Court, Williams, Cardenas).
    Although the rules authorize the Court to deem undisputed the Jones MSJ's and Ali MSJ's asserted facts, see Fed. R. Civ. P. 56(e)(2); D.N.M. LCvR 56.1(b), the Court will, to the extent possible, grant the Plaintiffs' request to treat the A. Ramirez MSJ's facts statement as responsive to the Defendants' facts statements.  Cf. Fed. R. Civ. P. 1 ("These rules . . . should be construed, administered, and employed by the court and the parties to secure the just . . . determination of every action and proceeding.").  This approach is possible when the A. Ramirez MSJ offers one version of the same set of facts that the Ali MSJ or Jones MSJ offers -- e.g., characterizing the same events at issue.  In such a scenario, the Court will deem the Plaintiffs as disputing the Defendants' version of the facts.  The Court's allowance, however, does not extend to areas where the A. Ramirez MSJ does not already overlap with the Ali MSJ or the Jones MSJ.  For example, when the Ali MSJ or Jones MSJ asserts facts on a subject that the A. Ramirez MSJ does not address, then it is not possible for the Court to treat the A. Ramirez MSJ as responsive to the Defendants' version.  In such situations, so long as the Defendants' motions point to record evidence, the Court will deem undisputed the Defendants' facts.

a recording of the 911 call and footage from Jones' lapel camera.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); 1. 2019-12-08_16.46.27_Ch26-Kyndra Pacheco at 00:00-00:35 ("911 Call"), filed with Notice of Filing, filed August 14, 2023 (Doc. 55)("Notice of Filing"); 1. 2019_1208_170526H101251_001600-001 at 00:00-05:00 ("Jones Lapel Video A"), filed with Notice of Filing; 2. 2019_1208_173527H101251_001600-002 at 07:45-08:15 ("Jones Lapel Video B"), filed with Notice of Filing.  The Court states the undisputed material facts in the text.  See Fed. R. Civ. P. 56.  The Court specifically notes the facts that are disputed, or purportedly disputed, in the footnotes.  The Court may treat as undisputed what the adduced documentary materials clearly depict.  See York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)("'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . .'" (quoting Scott v. Harris, 550 U.S. 372, 380 (2007))).

On December 8, 2019, police dispatch received a 911 call about an individual, later determined to be A. Ramirez.  See A. Ramirez MSJ ¶ 1, at 6 (asserting fact); Jones Response ¶ 1, at 5 (admitting fact); Ali Response at 3 (admitting fact); Jones MSJ ¶¶ 4-6, at 3-4 (asserting fact); Ali MSJ ¶¶ 2-3, at 1-2 (asserting fact); 911 Call at 00:00-00:35.  The female 911 caller reported that her neighbor, A. Ramirez, was drunk, screaming obscenities, goading neighbors to fight him, and waving a rifle around.[3]  See A. Ramirez MSJ ¶ 1, at 6 (asserting fact); Jones Response ¶ 1, at

---

[3]The Plaintiffs' operative complaint alleges that A. Ramirez was waving around a BB gun. See Ramirez' Second Amended Complaint for Civil Rights Violations ¶ 13, at 3, filed May 12, 2022 (Doc. 20)("SAC")("Mr. Ramirez went outdoors, Daisy BB Gun in hand, and screamed in anger and frustration toward the home of Neighbor No. 1.").  The A. Ramirez MSJ, however, does not assert as a fact that A. Ramirez was waving a BB gun around.  See A. Ramirez MSJ at 1-5 (no reference to BB gun or air pellet gun).  The Jones MSJ and the Ali MSJ assert the BB gun fact but

5 (admitting fact); Ali Response at 3 (admitting fact); Jones MSJ ¶¶ 4-6, at 3-4 (asserting fact); Ali

MSJ ¶¶ 2-3, at 1-2 (asserting fact); 911 Call at 00:00-00:35.  The 911 caller asserts that A. Ramirez

was "threatening everyone" and that A. Ramirez said he was going to "start World War III with

us," i.e., with his neighbors.[4]   The 911 caller does not indicate whether A. Ramirez pointed his

rifle at anyone or had fired his rifle.  See A. Ramirez MSJ ¶ 6, at 7 (asserting fact); Jones Response

¶ 6, at 5 (admitting fact); Ali Response at 3 (admitting fact); 911 Call at 00:00-00:35.  Police

dispatch informed Jones and Ali, a Deputy of the Sierra County Sheriff's Department and a New

---

cites only the SAC and no other record evidence.  See Jones MSJ ¶ 3, at 3; Ali MSJ ¶ 2, at 1-2.
No record evidence indicates that the object that A. Ramirez' neighbors observed him waving was
a BB gun rather than a firearm.

[4]The Court deems the above-the-line proposition undisputed.   Unambiguous record
evidence establishes this proposition.  See 911 Call at 00:15-00:35; York v. City of Las Cruces,
523 F.3d at 1210.  Moreover, the parties agree on the substance of this proposition.  The Plaintiffs
assert that the 911 caller states that A. Ramirez was threatening neighbors, although the Plaintiffs
assert that the threats were allegedly not specific, but general.  See A. Ramirez MSJ ¶ 5, at 7 n.5
(asserting fact)("No allegations were made during the call to dispatch that the neighbor had made
specific threats to harm someone, rather the threats were generalized."); id. n.8 ("Mr. Ramirez was
reported as threatening that he would start 'World War 3.'").  Jones disputes that the 911 call did
not allege specific threats.  See Jones Response ¶ 5, at 5 ("The reporting party informed dispatch
that Plaintiff was threatening 'us', and Dispatch advised Jones and Ali that Plaintiff was
threatening the 'neighbors' with a rifle. Jones recalls the dispatch as "a man waving around a rifle
threatening people."").  Ali does not specifically dispute the A. Ramirez MSJ's characterization of
the call.  See Ali Response at 3 ("In response to Plaintiffs' Fact Nos. 1-10, 12-30, 31-33, 35-36,
47 and 49, the referenced documents and videos are the best evidence of the facts being alleged
and do not need to be revised by Plaintiffs' faulty reiteration and interpretation.   These facts are
disputed to the extent they are inconsistent with the referenced documents and videos.").   The
Jones MSJ and the Ali MSJ both assert the 911 call's general contents.   Jones MSJ ¶ 5, at 3
("Dispatch received information from the neighbor (the calling or reporting party), that Plaintiff
was waving a rifle and 'threatening everyone' and 'telling them that he's going to start World War
3 with us'" (quoting 911 Call); Ali MSJ ¶ 2, at 1-2 ("A neighbor called the Sierra County Sheriff's
dispatch and stated that Mr. Ramirez was brandishing a gun and threatening to shoot people.").
Aside from the characterization whether the 911 call's alleged threats are specific or not, the parties
do not dispute that the call contains the threats described and quoted in the above-the-line
proposition.  Accordingly, the Court deems undisputed that the 911 caller made the assertions
described above.

Mexico State Police Officer, respectively, of the call's contents -- namely, that A. Ramirez had a rifle and was threatening his neighbors.  See A. Ramirez MSJ ¶¶ 1, 3-4, at 6 (asserting fact); Jones Response ¶ 1, 3-4 at 5 (admitting fact); Ali Response at 3 (admitting fact); Jones MSJ ¶¶ 5-6, at 3-4 (asserting fact); Ali MSJ ¶¶ 11, 18, at 2-3 (asserting fact); Dispatch to Officers at 00:00-00:20.

The area in Cabello, New Mexico, where the Ramirezes live and where the events occurred, is rural and remote.  See A. Ramirez MSJ ¶ 8, at 7 (asserting fact); Jones Response ¶ 8, at 6 (admitting fact); Ali Response at 3 (admitting fact).  When Jones and Ali arrived on the scene, they spoke to the reporting neighbors and a second neighbor, each of whom confirmed that A. Ramirez was screaming and threatening his neighbors.  See A. Ramirez MSJ ¶¶ 10-11, 13-14, 16-22, at 7-8 (asserting fact); Jones Response ¶ 10-11, 13-14, 16-22, at 6 (admitting fact); Ali Response at 3 (admitting fact); Jones MSJ ¶¶ 7, 9-10, at 4 (asserting fact); Ali MSJ ¶ 4, at 2 (asserting fact); Jones Lapel Video A at 00:00-05:00.  The second neighbor stated that she had on a prior occasion called police about A. Ramirez threatening his neighbors, and Jones recalled that he was the responding officer on that prior occasion.  See Jones MSJ ¶ 10, at 4 (asserting fact); Jones Lapel Video A at 03:13-04:23.  During these interviews, A. Ramirez was audible screaming obscenities from a distance.[5]

---

[5]The Court deems the above-the-line proposition undisputed.  Unambiguous record evidence establishes this proposition.  See Jones Lapel Video A at 00:00-05:00; York v. City of Las Cruces, 523 F.3d at 1210.  Moreover, the parties agree on the substance of this proposition. The Plaintiffs assert that A. Ramirez was yelling when officers arrived.  See A. Ramirez MSJ ¶ 11, at 7 ("Defendants Jones and Ali decide to first confront Mr. Ramirez due to him yelling as they arrive and them being unsure whether or not he had a weapon.").  Jones also asserts that A. Ramirez was yelling audibly.  Jones MSJ ¶ 11, at 58 ("Deputy Jones testified that the whole time he was standing with the reporting party, he could hear Plaintiff yelling and screaming and that he had no idea if Plaintiff was still armed or what his intentions were by them (the Officers) showing up there either.");  Jones MSJ ¶ 11, at 4-5 ("[T]he whole time [Jones] was standing with the reporting party, he could hear Plaintiff yelling and screaming and that he had no idea if Mr. Ramirez was still armed or what his intentions were.").  The Plaintiffs' asserted fact, however, also

When they approached A. Ramirez, Jones and Ali observed that A. Ramirez did not have a rifle in his hands, but he shouted obscenities at them and refused to engage with them when they tried to speak with him.  See A. Ramirez MSJ ¶¶ 25-31, at 9 (asserting fact); Jones Response ¶¶ 25-31, at 7 (admitting fact); Ali Response at 3 (admitting fact); Jones MSJ ¶¶ 12-13, at 5 (asserting fact); Ali MSJ ¶ 4, at 2 (asserting fact); Jones Lapel Video A at 05:30-06:10.  The rifle's location was unknown to Jones and Ali, and they did not know if A. Ramirez otherwise was armed.  See Jones MSJ ¶ 11, 16, at 4-5 (asserting fact); Jones Lapel Video A at 05:30-06:15.  Instead of responding to Jones and Ali's attempts to communicate with him, A. Ramirez turned away from them and began heading into his residence.  See Ramirez ¶¶ 27-31, at 9 (asserting fact); Jones Response ¶¶ 27-31, at 7 (admitting fact); Ali Response at 3 (admitting fact); Jones MSJ ¶ 13, at 5 (asserting fact); Ali MSJ ¶ 4, at 2 (asserting fact); Jones Lapel Video A at 06:05-06:15.  At that time, from about fifteen feet away, Jones and Ali rushed A. Ramirez, Jones tackled A. Ramirez to the ground, leaning his shoulder into A. Ramirez as the two men collided, and Jones and Ali handcuffed A. Ramirez.  See A. Ramirez MSJ ¶¶ 33, 35, at 10 (asserting fact); Jones Response ¶¶ 33, 35, at 7-8 (admitting fact); Ali Response at 3 (admitting fact); Jones MSJ ¶ 14, at 5 (asserting fact); Ali MSJ ¶ 19, at 4 (asserting fact); Jones Lapel Video A at 06:10-06:15.  The whole action

---

asserts that the officers did not "begin[] their investigation by gathering information regarding the basis of the reporting party's call," A. Ramirez MSJ ¶ 11, at 7, and it is this portion of the Plaintiffs' fact that the Defendants dispute.  See Jones MSJ ¶ 11, at 6 ("The Fact is disputed.  Jones received information from dispatch and upon arrival could hear Plaintiff screaming."); Ali MSJ ¶ 11, at 3 ("Officer Ali specifically disputes this fact and points out that there was no prohibition for a law enforcement officer to decide to approach a suspect rather than interview the person who made the call to dispatch.").  The Court deems conclusory the Plaintiffs' assertion that the officers performed no investigation, which states a quasi-legal conclusion whether the Defendants' actions were investigatory.  Moreover, disagreement whether the officers' conduct did not amount to a follow-up investigation does not obviate agreement among the parties that officers could hear A. Ramirez yelling obscenities from a distance.  The record unambiguously establishes that fact, and the Court deems it undisputed.

of disabling A. Ramirez by tackling him and placing him in handcuffs lasted approximately thirty seconds.  See Jones Lapel Video A at 06:16-06:45.  The location where Jones and Ali apprehended A. Ramirez was on the walkway into A. Ramirez' home, approximately five feet from the foot of a short staircase, and was inside a chain-link fence approximately three or four feet high that does not obscure an onlooker's view onto the Ramirez front lawn.  See A. Ramirez MSJ ¶¶ 31, 33, 39, at 10 (asserting fact); Jones Response ¶ 31, 33, 39, at 7-8 (admitting fact); Ali Response at 3-5 (admitting fact); Jones MSJ ¶ 13, at 5 (asserting fact); Ali MSJ ¶ 19, at 4 (asserting fact); Jones Lapel Video A at 06:05-06:45.  One minute after placing A. Ramirez in handcuffs, Jones, with A. Ramirez' permission, raises A. Ramirez off the ground so that A. Ramirez can be seated more comfortably while detained.  See A. Ramirez MSJ ¶ 35, at 10; Jones Response ¶ 35, at 8 (admitting fact); Ali Response at 3 (admitting fact); Jones Lapel Video A at 07:35-09:10.  Jones and Ali later permit A. Ramirez to stand while he speaks with them.  See Jones Lapel Video A at 06:35-07:00.  Jones stated that he was not yet placing A. Ramirez under arrest, but only was detaining A. Ramirez for investigation.  See Jones MSJ ¶ 17, at 6 (asserting fact); Jones Lapel Video A at 18:45.

A. Ramirez, although he denied that he pointed his rifle at anyone, told the officers that earlier that day he "shot [his] fucking .22 off" in the area.[6]  See Jones MSJ ¶ 18, at 6 (asserting fact); Jones Lapel Video A at 07:52-08:05.  A. Ramirez appeared intoxicated and acknowledged

---

[6]A ".22" is a standard size for a firearm cartridge.  See .22 Caliber, Wikipedia, https://en.wikipedia.org/wiki/.22_caliber (last visited August 22, 2024).  It is used as ammunition for .22 long rifles, although it is also a standard air gun pellet size caliber.  As noted above, see n.3, at 4, Ramirez' SAC asserts that he had been waving a BB gun in the air, see SAC ¶ 13, at 3, so he may have been referencing to the officers that he fired his ".22" BB gun.  Jones Lapel Video A at 07:52-08:05.  As noted, however, there is no record evidence that A. Ramirez possessed a .BB gun, rather than a real firearm.  See n.3, at 4-5, supra.

that he was drunk.  See Jones MSJ ¶¶ 19-21, at 6 (asserting fact); Jones Lapel Video A at 10:30-

10:40.   He also acknowledged the propriety of his apprehension and detention under the

circumstances, in this exchange:

> Jones:        Do you see where I'm coming from on the detention portion?
> 'Cus when we walked up, you're screaming and hollering at us.  You turned the
> corner to go up to the house, we don't know if you're gonna get a gun, or what
> you're gonna do.
>
> A. Ramirez:    That's true.  That's true, bro.

Jones Lapel Video A at 13:00-13:30.   See Jones MSJ ¶ 23, at 6 (asserting fact).   A. Ramirez

acknowledged he had acted improperly: "I understand; I did wrong."   Jones Lapel Video A at

14:45.  See Jones MSJ ¶ 24, at 6 (asserting fact).

S. Ramirez, A. Ramirez' wife, emerged from the house during the encounter, and spoke

with A. Ramirez and the officers.  See Jones Lapel Video A at 16:20-22:30.  During the remainder

of Jones and Ali's encounter with A. Ramirez, Jones and Ali did not handcuff, restrain or place

their hands on S. Ramirez.  See Jones MSJ ¶¶ 32a-33, at 7 (asserting fact);[7] Ali MSJ ¶ 28, at 5

(asserting fact); Jones Lapel Video A at 05:30-22:30.  The officers did not tell S. Ramirez that they

were detaining her or that she was not free to leave.  See Jones MSJ ¶¶ 32a-33, at 7 (asserting fact);

Ali MSJ ¶ 28, at 5 (asserting fact); Jones Lapel Video A at 05:30-20:55.

While Ali continued to detain A. Ramirez, Jones spoke again with the reporting neighbors,

who, upon Jones' inquiries, clarified that A. Ramirez had not pointed his rifle at them, but instead

only waved it around.  See Jones MSJ ¶¶ 26, 28, at 6-7 (asserting fact); Jones Lapel Video B at

---

[7]What the Court labels the Jones MSJ's ¶¶ 32a-33 reflects a typographical error in the Jones
MSJ: there are two paragraphs labeled "31." and two paragraphs labeled "32."  See Jones MSJ at
7.  The Court therefore refers to the first and second labeled "32."  paragraphs as "32a" and "32b"
respectively.

07:45-08:15.   The neighbors showed Jones cellphone video that they took that day showing A. Ramirez on his property, waving his rifle, gesticulating at the neighbors, and shouting obscenities at them.   See Jones MSJ ¶ 28, at 6-7 (asserting fact); Jones Lapel Video B at 02:00-04:00.   A. Ramirez was charged with negligent firearm use, resisting arrest, and public nuisance charges.   See Jones MSJ ¶¶ 29, 31 at 7 (asserting fact); Criminal Complaint, filed August 14, 2023 (Doc. 54-1)("State Criminal Complaint").

## PROCEDURAL BACKGROUND

The operative complaint, the SAC, contains live allegations that Jones and Ali, violated A. Ramirez' and S. Ramirez' Fourth Amendment rights against unreasonable search and seizure.   In the course of the litigation, the Plaintiffs have dropped a number of liability claims.   For example, the Plaintiffs have dismissed voluntarily with prejudice claims under the New Mexico Tort Claims Act that the SAC asserts.   See Stipulated Order Dismissing Counts IV-X of the Second Amended Complaint with Prejudice at 1, filed March 25, 2024 (Doc. 90)("Stipulated Dismissal").   The Plaintiffs also have dismissed the SAC's freestanding excessive force claim, with the understanding that they still may assert excessive force as a theory of Fourth Amendment seizure liability, a claim which the parties acknowledge remains live.   See Stipulated Dismissal at 1 ("Count IV - X of the Second Amended Complaint . . . are hereby dismissed with prejudice."); SAC ¶¶ 74-78, at 9 (containing a claim for "Count VIII - Excessive Force").   Although the Stipulated Dismissal does not dismiss explicitly Sierra County, the Stipulated Dismissal dismisses the SAC's "respondeat superior" liability claim against the Sierra County, which was the SAC's only claim of liability against Sierra County.

The Plaintiffs previously had dismissed other Defendants that were originally named.   Per the parties' stipulation, the Court dismissed without prejudice Defendant Joel Trejo.   See

Stipulated Order Dismissing Joel Trejo Without Prejudice at 1, filed March 24, 2023 (Doc. 36). Per the parties' stipulation, the Court dismissed with prejudice Defendant New Mexico Department of Public Safety.  See Stipulated Order of Dismissal with Prejudice of Defendant New Mexico Department of Public Safety at 1, filed October 24, 2023 (Doc. 75).  The Plaintiffs also indicated their non-opposition to "[d]ismissal of all municipal liability claims brought against Defendant Board of County Commissioners[] as requested in [Doc 72]," and "[d]ismissal of Plaintiff Alvin Ramirez's claim of malicious prosecution as requested in [Doc 72]."  Plaintiffs' Notice of Non-Opposition, filed November 20, 2023 (Doc. 82).  The Court, however, has not entered a stipulated order regarding the Board of County Commissioners and the malicious prosecution claim.[8]

In the A. Ramirez MSJ, A. Ramirez argues that he is entitled to summary judgment that the Defendants violated his Fourth Amendment rights.  Notably, the A. Ramirez MSJ contains no argument how the Defendants violated S. Ramirez' rights: the A. Ramirez MSJ focuses only on how the Defendants violated A. Ramirez' rights.  See A. Ramirez MSJ at 16-25.  Subsequently, Jones and Ali each moved for summary judgment on the basis of qualified immunity.  See Jones MSJ at 1; Ali MSJ at 1.  The Court held a hearing on the A. Ramirez MSJ, the Jones MSJ and the Ali MSJ.  See Transcript of Hearing, taken November 21, 2023.[9]  The Court entered an Order denying the A. Ramirez MSJ, because the Court concludes there that the undisputable facts

---

[8]Because the parties have stipulated to the Board of County Commissioners of Sierra County's dismissal and the  malicious prosecution claim's dismissal, the Court will dismiss that party and that claim.  See infra at 44.

[9]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

demonstrate that Jones and Ali's conduct is Constitutionally justified and that they did not violate A. Ramirez' Fourth Amendment rights.  See Order at 1, filed March 25, 2024 (Doc. 89)("Order"). The Court's Order does not address the Jones MSJ or the Ali MSJ.

## LAW REGARDING QUALIFIED IMMUNITY

Under the doctrine of qualified immunity, government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Est. of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  A right is clearly established when it is "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right."  Reichle v. Howards, 566 U.S. 658, 664 (2012).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  The Supreme Court of the United States, however, recently suggested that a plaintiff need not, in every situation, point to a case that is sufficiently factually similar.  See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor")("[N]o reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary

conditions for such an extended period of time.").  The Tenth Circuit has understood <u>Taylor</u> to clarify that it is no longer the case that an almost-identical case must exist for a constitutional violation to be clearly established.  <u>See</u> <u>Truman v. Orem City</u>, 1 F. 4th at 1241 ("Just like any reasonable corrections officer should have understood the inmate in <u>Taylor</u>'s conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution.").  The Court proceeds with both lines of analysis:

> An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, <u>see</u> <u>Thomas v. Kaven</u>, 765 F.3d  at 1194, or, in rare cases, by "general constitutional principles," <u>Routt v. Howry</u>, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, <u>Taylor</u>, 141 S. Ct. at 54.

<u>Caldwell v. Univ. of N.M. Bd. of Regents</u>, No. CIV 20-0003, 2023 WL 4236016, at *36 (D.N.M. June 28, 2023)(Browning, J.).

To evaluate a motion to dismiss on the grounds of qualified immunity, "a court must consider 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'"  <u>Leverington v. City of Colo. Springs</u>, 643 F.3d 719, 732 (10th Cir. 2011)(quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009)).  The Tenth Circuit "uses the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally."  <u>Shero v. City of Grove</u>, 510 F.3d 1196, 1200 (10th Cir. 2007).  Because qualified immunity "is an immunity from suit rather than a mere defense to liability," <u>Serna v. Colo. Dep't of Corr.</u>, 455 F.3d 1146, 1150

(10th Cir. 2006), "the claim is dismissed" where the "plaintiff's allegations, if true" cannot "establish a constitutional violation," Shero v. City of Grove, 510 F.3d at 1204.

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (1978))). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357

(1967)(footnotes omitted).

1.      **Reasonable Government Searches**.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." (quoting United States v. Knights, 534 U.S. 112, 118 (2001))).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it

is needed for the promotion of legitimate governmental interests'" (quoting <u>United States v.</u> <u>Knights</u>, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."   At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

<u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. at 652-53 (1995)(quoting <u>Skinner v. Ry. Labor</u> <u>Executives' Ass'n</u>, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

<u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  <u>See</u>, <u>e.g.</u>, <u>United States v. Knights</u>, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); <u>Banks v. United States</u>, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); <u>Boling v. Romer</u>, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining

and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring) (quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Florida v. Jardines, but not in Georgia v. Randolph).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, noted: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

### 2.      **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no

'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d at 1314 (citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419, 2010 WL 965743, at *12 (D.N.M. February 19, 2010)(Browning, J)(alterations in United States v. Sedillo, but not in United States v. Ledesma or United States v. Anderson).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity."  United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "'should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way.'"  United States v. Drayton, 536 U.S. 194, 205 (2002)(quoting Imm. & Naturalization Serv. v. Delgado, 466 U.S. 210, 219 (1984)).  Additionally, "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.  Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'" (quoting United States v. Guerrero, 472 F.3d at 789-90)).  For example, in

United States v. Ringold, the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See United States v. Ringold, 335 F.3d at 1175.

In United States v. Gordon, 173 F.3d 761 (10th Cir. 1999), the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag.  See 173 F.3d at 765.  The officer asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage and the suspect gave his consent.  See 173 F.3d at 765.  She asked him whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765.  When the officer encountered the suspect's locked bag, she asked him if he could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]."  173 F.3d at 766.  The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag."  173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage.  See 173 F.3d at 766.  The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include.  See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances.  See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect that the object of the search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a

search of any area within the confines of the officer's request where the object may be found. United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs"). See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect does not object to the officer's search, it indicates that "the search was within the scope of consent." United States v. Gordon, 173 F.3d at 766. See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics). Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags. 173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")). The Tenth Circuit emphasized: "We consistently and repeatedly have

held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

**ANALYSIS**

The indisputable facts demonstrate that Jones and Ali did not violate A. Ramirez' or S. Ramirez' Fourth Amendment rights against unreasonable seizure or unreasonable search, and that no clearly established law holds that Jones and Ali violated the Plaintiffs' rights.  Jones and Ali thus are entitled to summary judgment on the basis of qualified immunity.  The Court thus grants the Jones MSJ and the Ali MSJ, and denies the A. Ramirez MSJ.  The Court first addresses the alleged violations of A. Ramirez' rights against unreasonable seizure and search, and then addresses the alleged violations of S. Ramirez' rights against unreasonable seizure and search.

**I.     NEITHER JONES NOR ALI VIOLATED A. RAMIREZ' FOURTH AMENDMENT RIGHTS.**

The unambiguous record evidence demonstrates that A. Ramirez' rights were not infringed.  The officers had sufficient information -- probable cause or reasonable suspicion -- to either detain or arrest A. Ramirez without a warrant.  The Court also concludes that the exception to the warrant requirement for warrantless arrests in a home does not apply, because the officers did not arrest A. Ramirez in his home or within his home's curtilage; even if the seizure occurred in the curtilage, exigent circumstances existed justifying the warrantless seizure in the curtilage. Jones and Ali also did not search unconstitutionally A. Ramirez' person or his home.

**A.     JONES AND ALI POSSESSED PROBABLE CAUSE THAT A. RAMIREZ COMMITTED FELONIES OR PUBLIC DISORDER MISDEMEANORS.**

The unambiguous facts demonstrate that, at the time they tackled A. Ramirez, Jones and Ali  possessed  probable  cause  that  A. Ramirez  committed  felonies  --  namely,  assault  and

aggravated assault -- and misdemeanors -- namely, negligently using a firearm, public nuisance, and resisting arrest.  Because the Court concludes that the officers possessed probable cause as to these offenses, the Court also necessarily concludes that the officers possessed reasonable suspicion, a lesser-included quantum of information.  See Terry v. Ohio, 392 U.S. 1, 27 (1968)(holding that the reasonable suspicion required for an investigatory detention is less than the "probable cause [necessary] to arrest the individual for a crime").  Determining what quantum of information the officers possessed depends on what they knew and when they knew it.  What Jones and Ali observed upon arriving on the scene provided probable cause that A. Ramirez was violating multiple criminal laws.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000)("Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." (quoting Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995))).  An identified source's 911 tip and reliable basis of knowledge, which officers' follow-up investigation corroborates, can supply probable cause.  See Alabama v. White, 496 U.S. 325, 328-29 (1990)("[A] 'totality of the circumstances' approach . . . determine[es] whether an informant's tip establishes probable cause. . . . [Such] factors [as] . . . an informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . [are] 'highly relevant in determining the value of his report.'" (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983)(alterations the Court's))).  Specifically, what they observed provided probable cause that A. Ramirez had committed or was committing in their presence two felonies and three misdemeanor violations:  (i) aggravated assault, see N.M.S.A. § 30-3-2 ("Aggravated assault consists of either . . . unlawfully assaulting or striking at another with a deadly weapon."); State v. Armijo, 2005-NMCA-010, ¶ 25, 136 N.M. 723, 729, 104 P.3d 1114, 1120 ("A defendant could be

convicted of aggravated assault by merely threatening the victim with bodily harm."); (ii) assault, see N.M.S.A. §30-3-1(B) ("Assault consists of . . . any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery."); (iii) negligently using a firearm, see N.M.S.A. § 30-7-4; (iv) public nuisance, see N.M.S.A. § 30-8-1; and (v) resisting arrest, see N.M.S.A. § 30-22-1.

What Jones and Ali knew about A. Ramirez provided probable cause for a custodial arrest. Everything that Jones and Ali observed when they arrived on the scene was consistent with the proposition that A. Ramirez had committed or was committing several criminal offenses, including felonies. A. Ramirez is incorrect to assert that Jones and Ali performed no investigation before seizing him. See A. Ramirez MSJ at 2 ("Nor did [Jones and Ali] perform any investigation prior to seizing Mr. Ramirez even though they had more than sufficient opportunity to do so."). They arrived at the residence's area following up on a 911 call reporting an intoxicated man waving around a rifle and threatening his neighbors, see 911 Call at 00:00-00:35; two sets of neighbors, upon the officers' arrival, supported that narrative, and indeed one neighbor indicated A. Ramirez had on previous occasions threatened his neighbors, resulting in a police call, to which Jones was the responding officer, see Jones Lapel Video A at 00:00-05:00; the officers' first-hand observations corroborated those accounts, because they heard A. Ramirez screaming obscenities audible from over one-hundred feet away, and then saw him doing the same to the officers' directly, see Jones Lapel Video A at 00:00-06:15.

That A. Ramirez was not carrying his rifle when Jones and Ali saw him does not vitiate probable cause, because what Jones and Ali observed otherwise was consistent with and corroborated the neighbors' account that A. Ramirez threateningly had brandished a firearm while intoxicated. See United States v. Artez, 389 F.3d 1106, 1115 (10th Cir. 2004)("'[W]hat is needed

[for probable cause] is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations.'" (quoting Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.3(f), at 168 (3d ed. 1996)(the Court's alterations))). Although the officers did not see him carrying a rifle, they did not know whether A. Ramirez had a pistol or other firearm on his person, and they did not know where the rifle was and, thus, how quickly A. Ramirez could take it into his hands if not detained immediately. A. Ramirez at the time acknowledged these actions' reasonableness. See Jones Lapel Video A at 13:00-13:30 ("That's true. That's true, bro.").

Some facts known to the officers at the time cut against probable cause as to the felony aggravated assault and assault, but that contradictory information is insufficient to overcome otherwise sufficient information to believe A. Ramirez committed those felonies. The Plaintiffs stress that Jones and Ali could not have believed that A. Ramirez committed assaultive crimes, because: (i) the 911 call does not assert specifically that A. Ramirez had pointed a gun at the neighbors; and (ii) when Jones and Ali arrived, the neighbors were not hiding from A. Ramirez in fear, suggesting they did not believe their lives were in immediate danger. Both facts, the Plaintiffs are correct, undercut the information suggesting that assault or aggravated assault occurred. See N.M.S.A. §30-3-1(B) ("Assault consists of . . . any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery."); N.M.S.A. § 30-3-2 ("Aggravated assault consists of either . . . unlawfully assaulting . . . another with a deadly weapon."); State v. Armijo, 2005-NMCA-010, ¶ 25, 136 N.M. at 729, 104 P.3d at 1120 ("A defendant could be convicted of aggravated assault by merely threatening the victim with bodily harm."). Despite these contradictory indications, however, the Court concludes that Jones and Ali possessed probable cause that A. Ramirez committed assault or aggravated

assault.  Police officers need not possess a perfect picture of the facts: it is sufficient that a prudent person would believe the crime had occurred, and it is not imprudent under the circumstances to believe that A. Ramirez' threatening behavior constituted assault.  See Alabama v. White, 496 U.S. at 328-29 ("[A] 'totality of the circumstances' approach . . . determine[es] whether an informant's tip establishes probable cause. . . . [Such] factors [as] . . . an informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . [are] 'highly relevant in determining the value of his report.'" (quoting Illinois v. Gates, 462 U.S. at 230 (1983)(alterations the Court's))); Oliver v. Woods, 209 F.3d at 1186 ("Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." (quoting Romero v. Fay, 45 F.3d at 1475)).

Because what matters for probable cause is what Jones and Ali knew at the time of A. Ramirez' detention, what the officers learned and determined later does not affect the analysis. Thus, that Jones and Ali learned later from the neighbors that A. Ramirez had not pointed his gun directly at anyone, see Jones MSJ ¶¶ 26, 28, at 6-7; Jones Lapel Video B at 07:45-08:15, and that the State of New Mexico did not charge A. Ramirez with assault, suggesting that State prosecutors might have concluded that probable cause as to assault was lacking, see Criminal Complaint at 1, does not undermine that, at the time, Jones and Ali prudently could have believed that A. Ramirez committed assault or aggravated assault.  The information available to officers often evolves rapidly, so that contradictory information learned at a later time does not undermine necessarily that probable cause exists at an earlier moment, so long as the factual picture available to officers

at the time was sufficient.[10]  Finally, these conflicting pieces of information in no way undermine probable cause regarding the misdemeanors -- negligently using a firearm, public nuisance, and resisting arrest.

In sum, the Court concludes that Jones and Ali possessed probable cause that A. Ramirez committed two felonies and three misdemeanor offenses.  They had probable cause to believe the felonies had occurred just before they arrived and that some of the misdemeanors, particularly the public nuisance, occurred in their presence.  In the alternative, the Court concludes that Jones and Ali possessed reasonable suspicion to investigate these offenses' commission.

**B.    A. RAMIREZ' SEIZURE IS BEST CHARACTERIZED AS AN INVESTIGATORY DETENTION.**

Although the Court concludes that Jones and Ali possessed probable cause, which supports arrest, the Court concludes that Jones and Ali did not initially effect an arrest on A. Ramirez, but a Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), stop, for which reasonable suspicion suffices; although ultimately the officers did arrest A. Ramirez, the initial part of their encounter was a Terry detention.   A. Ramirez' detention can be characterized as an investigatory detention, although he was handcuffed, the officers used force, and the seizure lasted approximately half an hour: no one feature forecloses the seizure's characterization as an investigatory detention.  Cf. United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994)("[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a Terry detention into a

---

[10]Even if this conflicting information undermined probable cause as to the two assault felonies, it does not undermine reasonable suspicion: the conflicting information was grist for further investigation of what otherwise appeared to be felonious conduct.  Accordingly, even if the Court concluded that this conflicting information vitiated Jones and Ali's probable cause, the Court would conclude that they still possessed reasonable suspicion regarding the felonies.

full custodial arrest -- for which probable cause is required -- when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d 1455, 1463-64 (10th Cir. 1993))).   In potentially dangerous encounters, such as the one with which A. Ramirez presented the officers -- he was drunk, agitated, and likely was armed -- the use of more intrusive methods of seizure will fall on the Terry side of a detention rather than on the side of custodial arrest.  See United States v. Soza, 686 F. App'x 564, 569 (10th Cir. 2017)("[I]n the cases where we have upheld officers' brandishing of firearms and use of handcuffs during an investigatory *Terry* stop, the officers generally either knew or had reason to believe the suspects were armed, or they had personally witnessed the suspects acting violently.");[11] United States v. Melendez-Garcia, 28 F.3d at 1052 ("[O]fficers acted reasonably [in effecting a Terry detention] when they ordered the occupants out of a car at gunpoint and forced them to lie on the ground when . . . suspects might be armed, it was late at night in a remote area, and there were only two officers." (describing United States v. Perdue, 8 F.3d at 1463)); United States v. Melendez-Garcia, 28 F.3d at 1052 ("[O]fficers' display of firearms and use of handcuffs was reasonable [in Terry

---

[11]United States v. Soza, 686 F. App'x 564 (10th Cir. 2017), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Soza has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

stop] when . . . suspect had threatened to kill someone and they observed the suspect violently pounding his fists in his truck." (describing United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993))). The Court notes that, although Jones says that A. Ramirez is not yet arrested, but instead that A. Ramirez is only being detained for investigation, Jones' subjective understanding of the encounter does not affect the analysis, because the analysis is an objective one. See Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011)("Fourth Amendment reasonableness 'is predominantly an objective inquiry.'" (quoting Indianapolis v. Edmond, 531 U.S. 32, 47 (2000))). Nonetheless, because the intrusion into A. Ramirez' privacy interests was roughly commensurate with the investigatory need, the apprehension can be characterized as an investigatory detention. Cf. United States v. Copening, 506 F.3d 1241, 1245-46 (10th Cir. 2007)(describing the Terry stop inquiry as, in part, "'whether [the detention] was reasonably related in scope to the circumstances which justified the interference in the first place'" (quoting Terry, 392 U.S. at 20)).[12]

Ultimately, however, what begins as A. Ramirez' investigatory detention develops into a custodial arrest, but it still is Constitutionally justified. Jones and Ali did ultimately book

---

[12]The Court agrees with A. Ramirez, however, that Jones and Ali's apprehension of A. Ramirez cannot be justified as a community caretaking apprehension: Jones and Ali were responding to neighbors' reports that A. Ramirez committed crimes, and not that A Ramirez was in need of help. Cf. Storey v. Taylor, 696 F.3d 987, 992-93 (10th Cir. 2012)("[I]n fulfilling their duties, police officers may exercise functions -- 'community caretaking functions' -- wholly separate and apart from detecting, investigating, or acquiring evidence of a crime.'" (quoting Lundstrom v. Romero, 616 F.3d 1108, 1120 (10th Cir. 2010))). To the extent that a community-caretaking doctrine can authorize non-investigatory seizures outside the home absent exigent circumstances, cf. Caniglia v. Strom, 593 U.S. 194, 196 ("The Cady v. Dombrowski, 413 U.S. 433 (1973)] acknowledgment of [police officers'] 'caretaking' duties [does not] create[] a standalone doctrine that justifies warrantless searches and seizures in the home."); id. at 199 ("[The] recognition that police officers perform many civic tasks in modern society was just that -- a recognition that these tasks exist, and not an open-ended license to perform them anywhere."), still that doctrine will not supply a basis for the seizure here, because Jones and Ali's conduct was crime-fighting and investigatory in nature, and not community-caretaking.

A. Ramirez on criminal charges, namely the three misdemeanors described above.  As noted, even though the Court concludes that Jones and Ali possessed probable cause that A. Ramirez committed felony offenses -- assault and aggravated assault -- A. Ramirez' arrest ultimately was predicated only on the misdemeanors.  That the arrest was only based on misdemeanors is not a Constitutional problem, because officers can effect a warrantless arrest about misdemeanors occurring in their presence about which they have probable cause, as A. Ramirez' misdemeanor offenses did.  See Tanberg v. Sholtis, 401 F.3d 1151, 1159 (10th Cir. 2005)("'If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.'" (quoting Atwater v. Lago Vista, 532 U.S. 318, 322 (2001))).[13]  The felony offenses occurred outside their presence, but they could effect an arrest on that basis too, because they possessed probable cause.  See United States v. Gonzalez, 107 F.4th 1304, 1308 (11th Cir. 2024)("'[A] police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . .'" (quoting Carroll v. United States, 267 U.S. 132, 156-57 (1925)).  Because the detention develops into a custodial arrest, the Court next considers whether the location where Jones and Ali arrested A. Ramirez -- namely, A. Ramirez' front lawn -- necessitates that they possessed a warrant or that exigent circumstances were present.

---

[13]Recent developments in other Circuits have eroded this proposition, but the Tenth Circuit has yet to hold that the Fourth Amendment does not require that a warrantless misdemeanor arrest be based only on a misdemeanor that occurs in an officer's presence.  See United States v. Gonzalez, 107 F.4th 1304, 1309-10 (11th Cir. 2024)("[E]very circuit to face this issue has 'held that the Fourth Amendment does not include an in-the-presence requirement for warrantless misdemeanor arrests.' . . . Today, we join our sister circuits and hold that the Fourth Amendment does not require a misdemeanor to occur in an officer's presence to conduct a warrantless arrest." (quoting Knight v. Jacobson, 300 F.3d 1272, 1276 n.3 (11th Cir. 2002))).

C.     **THE LOCATION OF A. RAMIREZ' ARREST DOES NOT REQUIRE A WARRANT OR EXIGENT CIRCUMSTNACES, ALTHOUGH, IN THE ALTERNATIVE, EXIGENT CIRCUMSTANCES EXISTED.**

That A. Ramirez' detention and ultimate arrest occurred on his front lawn does not necessitate that Jones and Ali possessed an arrest warrant or that exigent circumstances were present, because A. Ramirez' front lawn is not his home or curtilage for Fourth Amendment purposes; in the alternative, even if the arrest occurred within his Constitutional home, exigent circumstances existed justifying entry to detain and then arrest A. Ramirez.  Police may arrest suspects about whom they possess probable cause in a public place.  On the other hand, arrests that occur in the home or in the home's curtilage are unconstitutional unless both supported by probable cause and precipitated by exigent circumstances.  The location of A. Ramirez' detention and arrest does not violate his Fourth Amendment rights.

1.     **A. Ramirez' Arrest Did Not Occur Inside His Home or Within Its Curtilage.**

A. Ramirez' detention and arrest occurred in a public place for the Fourth Amendment's purposes, so Jones and Ali could arrest him there without a warrant; A. Ramirez' front lawn obviously is not home's interior, and it also is not the home's curtilage.  Law enforcement may arrest a person in a public place without a warrant.  See Bailey v. Swindell, 940 F.3d 1295, 1300 (11th Cir. 2019)("When it comes to warrantless arrests, the Supreme Court has drawn a 'firm line at the entrance to the house.' . . . Accordingly, . . . police don't need a warrant to make an arrest in a public place . . . ." (quoting Payton v. New York, 445 U.S. 573, 590 (1980))).  Because the home for the Fourth Amendment's purposes includes its curtilage -- that area immediately surrounding a home, connected with the home life's intimacies -- then a warrantless arrest within the curtilage must be supported by exigent circumstances, as the Supreme Court has suggested:

> [I]t is a "settled rule that warrantless arrests in public places are valid," but, absent another exception such as exigent circumstances, officers may not enter a home to make an arrest without a warrant, even when they have probable cause. *Payton v. New York,* 445 U.S. [at] 587-590 . . . . That is because being " 'arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home.' " *Id.,* at 588–589 . . . (quoting *United States v. Reed,* 572 F.2d 412, 423 (C.A.2 1978)). Likewise, searching a vehicle parked in the curtilage involves not only the invasion of the Fourth Amendment interest in the vehicle but also an invasion of the sanctity of the curtilage.

Collins v. Virginia, 584 U.S. 586, 595-96 (2018).  "Curtilage, the land immediately surrounding and associated with the home, 'is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' . . . As a result, curtilage 'has been considered part of home itself for Fourth Amendment purposes," and "warrants the Fourth Amendment protections that attach to the home.'" United States v. Shuck, 713 F.3d 563, 567 (10th Cir. 2013)(quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).  Four loose factors determine whether an area is curtilage:

> In *Dunn,* the Court more carefully defined this standard and articulated four factors used to determine whether a particular area was within the curtilage of a house: (1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation. [United States v. Dunn, 480 U.S. 294, 301 (1987)].

United States v. Cousins, 455 F.3d 1116, 1122 (10th Cir. 2006).  What is not a home's curtilage is a person's "open fields" -- that broader area beyond the home's immediate vicinity, law enforcement officers' entry into which does not constitute a search for the Fourth Amendment's purposes.  United States v. Hajduk, 396 F. Supp. 2d 1216, 1235 (D. Colo. 2005)(Babcock, C.J.)("The open fields doctrine recognizes that property owners have a lesser expectation of privacy in open areas of their land than they do in areas inside buildings or facilities. . . . Under this doctrine, the government may inspect open areas of an industrial complex from public airspace

without a warrant."). Trespass alone is insufficient for the analysis, as property lines are not the end-all-be-all of the Fourth Amendment. See United States v. Jones, 565 U.S. 400, 408 n.5 (2012)("[P]ost-[Katz v. United States, 389 U.S. 347 (1967)("Katz")] we have explained that "'an actual trespass is neither necessary *nor sufficient* to establish a constitutional violation.'" . . . That is undoubtedly true . . . ." (quoting United States v. Jones, 565 U.S. 400, 423 (2012)(Alito, J., concurring), in turn wholly quoting United States v. Karo, 468 U.S. 705, 713 (1984))). Thus, a front porch or the immediate entryway into a house, may be curtilage, but common areas in an apartment complex are not. See United States v. Maxwell, 668 F. Supp. 3d 427, 441 (E.D. Va. 2023)(Jackson, J.)("Unlike the apartment's front patio, the [United States Court of Appeals for the Fourth Circuit] found that the grass area was not curtilage because it was used by other apartment residents and located over twenty feet from the door of the defendant's apartment." (describing United States v. Jackson, 728 F.3d 367, 374 (4th Cir. 2013))). The United States Court of Appeals for the Tenth Circuit and other appellate courts have held that a front yard fully visible to the public is not a home's curtilage. See United States v. Vasquez, No. 22-1294, 2024 WL 34132, at *2 (10th Cir. January 3, 2024)("[T]he Dunn factors suggest that neither the yard nor driveway are curtilage. We previously applied Dunn to state that a front yard was not curtilage . . . and other circuits have held that shared driveways are not curtilage." (citing Reeves v. Churchich, 484 F.3d 1244, 1254-55 (10th Cir. 2007), then United States v. Coleman, 923 F.3d 450, 456 (6th Cir. 2019); United States v. Jones, 893 F.3d 66, 72 (2d Cir. 2018))).

The front yard of A. Ramirez' home is not part of his home's curtilage. Here, although the front yard is the area immediately next to the house and is enclosed by a chain-link fence, the fence is only thigh- or waist-high and the front yard was not otherwise obscured from the public; moreover, the front lawn is not put apparently to a purely private purpose, as A. Ramirez' front

lawn is the face that his home presents to the world.  United States v. Vasquez, 2024 WL 34132,

at *2; United States v. Bausby, 720 F.3d 652, 656-57 (8th Cir. 2013)("'What a person knowingly

exposes to the public, even in his own home or office, is not a subject of Fourth Amendment

protection.' . . . [W]hile the area was fenced, the fence was only a four or five foot chain-link fence

and not a fence designed to limit the observation of those passing by." (quoting Katz, 389 U.S. at

351)).  The Ramirez' front lawn is not curtilage for the Fourth Amendment's purposes.  For Fourth

Amendment seizure purposes, the Ramirez' front lawn is a public place.  See Bailey v. Swindell,

940 F.3d at 1300 ("When it comes to warrantless arrests, the Supreme Court has drawn a 'firm

line at the entrance to the house.' . . . Accordingly, . . . police don't need a warrant to make an

arrest in a public place . . . ." (quoting Payton v. New York, 445 U.S. at 590)).  Because, therefore,

Jones and Ali upon probable cause arrested A. Ramirez outside his home and its curtilage, exigent

circumstances need not exist justifying A. Ramirez' warrantless arrest.

### 2. Exigent Circumstances Justified A. Ramirez' Arrest, Even if the Arrest Was Effectuated Inside His Home's Curtilage.

Even if the Court concluded that the ultimate arrest occurred within A. Ramirez' home or

its curtilage, exigent circumstances justified that warrantless arrest.  If exigent circumstances exist,

then officers can effect a warrantless arrest inside the Constitutional home if they have probable

cause that a crime occurred, be it a felony or, in some situations, a misdemeanor:

> If . . . police have probable cause for an arrest, the existence of certain exigent
> circumstances may "overcome the presumption of unreasonableness that attaches
> to all warrantless home entries." Welsh v. Wisconsin, 466 U.S. 740, 750 . . . (1984)
> . . . . "To determine the existence of an exigency, a court must consider the gravity
> of the offense supporting arrest." Howard, 34 F.3d at 982 (citing Welsh, 466 U.S.
> at 753, 104 S.Ct. 2091).  "When the government's interest is only to arrest for a
> minor offense, that presumption of unreasonableness is difficult to rebut, and the
> government usually should be allowed to make such arrests only with a warrant
> issued upon probable cause by a neutral and detached magistrate." Welsh, 466 U.S.
> at 750, 104 S.Ct. 2091 (footnote omitted).

Mascorro v. Billings, 656 F.3d 1198, 1205 (10th Cir. 2011).  Although hot pursuit of a felony

suspect typically raises exigent circumstances, there is no per se rule prohibiting pursuit of

misdemeanor suspects into the home; rather, for misdemeanor suspects, the analysis proceeds on

a case-by-case basis, as the Supreme Court recently held:

> Our Fourth Amendment precedents thus point toward assessing case by case
> the exigencies arising from misdemeanants' flight. That approach will in many, if
> not most, cases allow a warrantless home entry. When the totality of circumstances
> shows an emergency -- such as imminent harm to others, a threat to the officer
> himself, destruction of evidence, or escape from the home -- the police may act
> without waiting. And those circumstances, as described just above, include the
> flight itself.

Lange v. California, 594 U.S. 295, 308 (2021).

Even if the arrest on A. Ramirez' front lawn is an arrest within his home's curtilage such

that the warrantless arrest requires probable cause and exigent circumstances, then those conditions

obtain.  As discussed above, Jones and Ali possessed probable cause that A. Ramirez committed

felonies: assault and aggravated assault.  Cf. Hill v. City of Fountain Valley, 70 F.4th 507, 515

(9th Cir. 2023)("Probable cause exists where the 'available facts suggest a fair probability that the

suspect has committed a crime.'" (quoting Tatum v. City & Cnty. of San Francisco, 441 F.3d 1090,

1094 (9th Cir. 2006))).  Although not categorically the case, the hot pursuit of a felony suspect

about whom there is probable cause usually presents exigent circumstances justifying warrantless

arrest within the Constitutional home.  See United States v. Thomas, 372 F.3d 1173, 1177 (10th

Cir. 2004)("The Supreme Court has recognized several types of exigent circumstances that may

justify a warrantless entry into a home, including the hot pursuit of a fleeing felon, the imminent

destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police

officers or other people inside or outside the home."); Lange v. California, 594 U.S. at 304-05

(declining to adopt the proposition that Supreme Court caselaw "treat[s] fleeing-felon cases categorically (that is, as *always* presenting exigent circumstances allowing warrantless entry)"). Moreover, even if A. Ramirez' offenses about which Jones and Ali possessed probable cause only were misdemeanors and not felonies, those misdemeanors nonetheless were dangerous, firearm-related offenses, and A. Ramirez was fleeing apprehension: under Lange v. California's totality-of-the-circumstances rule, these public-safety-threatening misdemeanors establish exigent circumstances justifying warrantless entry into A. Ramirez' home's curtilage to detain and arrest him.  See Lange v. California, 594 U.S. at 308 ("When the totality of circumstances shows an emergency -- such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home -- the police may act without waiting. And those circumstances, as described just above, include the flight itself.").  Because Jones and Ali first encountered A. Ramirez outside the home -- they first came face to face with him while they and he were walking toward each other on the public road adjacent to A. Ramirez' home -- he cannot vitiate their ability to seize him by retreating into the Constitutionally protected space of his house's curtilage.  Cf. Mascorro v. Billings, 656 F.3d 1198, 1206 (10th Cir. 2011)("'[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place.'" (quoting United States v. Santana, 427 U.S. 38, 43 (1976))(alternation the Court's)).    Accordingly, even if A. Ramirez' front lawn is his Fourth Amendment curtilage -- which, the Court concludes, it is not -- nevertheless, A. Ramirez' arrest was justified by probable cause and exigent circumstances where it occurred.

### D.   JONES AND ALI DID NOT VIOLATE A. RAMIREZ' FOURTH AMENDMENT RIGHT TO BE FREE FROM EXCESSIVE FORCE.

Jones and Ali did not use unconstitutionally excessive force in effecting A. Ramirez' seizure.  "[T]hree, non-exclusive factors [are] relevant to [an] excessive force inquiry: [i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether he is actively resisting arrest or attempting to evade arrest by flight."  Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009)(citing Graham v. Connor, 490 U.S. 386, 396 (1989))(brackets added)).  Each Graham v. Connor factor suggests the propriety of such non-lethal action as the tackle that brought down A. Ramirez: A. Ramirez was suspected of threateningly using firearms, he might have had the firearms on his person or had easy access to a firearm, and he refused to comply with the officers' order to halt.  See Scott v. Harris, 550 U.S. at 383 ("[I]n judging whether [the police officer] Scott's actions were reasonable, we must consider the risk of bodily harm that Scott's actions posed to respondent in light of the threat to the public that Scott was trying to eliminate.").  As noted above, Jones and Ali did not know if A. Ramirez had a firearm on his person or how quickly he could access his rifle.  That A. Ramirez was an older and smaller man than either Jones or Ali does not mean that they could not tackle him to the ground; officers are not permitted only to physically retrain suspects their same age and size, especially when dangerous offenses and firearms are involved, which can necessitate immediately controlling a situation, regardless of a suspect's physical characteristics.  Cf. Fisher v. City of Las Cruces, 584 F.3d at 894 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. . . . [P]olice officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force . . . necessary in a particular

situation.").  The lapel footage shows unambiguously that the physical altercation lasted less than thirty seconds, and that Jones and Ali allowed A. Ramirez to get more comfortable after placed in handcuffs.  The officers therefore did not unconstitutionally use excessive force on A. Ramirez.

In conclusion, Jones and Ali did not violate A. Ramirez' Fourth Amendment seizure rights, and even if they did, A. Ramirez points to no clearly established law holding that his seizure was unconstitutional.  The Court's independent research identifies no caselaw holding that a Fourth Amendment violation exists under these circumstances.  Accordingly, even if there were a violation, A. Ramirez cannot show that the law was clearly established that a Fourth Amendment violation occurs under these circumstances at the time he suffered his alleged violation, so Jones and Ali are entitled to qualified immunity.  See Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016)(placing burden on plaintiff to "show that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation").

**E.     JONES AND ALI DID NOT VIOLATE A. RAMIREZ' RIGHTS TO BE FROM UNLAWFUL SEARCH.**

Jones and Ali did not violate A. Ramirez' Fourth Amendment right to be free from unreasonable searches.  The Court deals briefly with this subject, because although the SAC asserts violations of both seizure and search rights, the A. Ramirez MSJ offers no argument that A. Ramirez' search rights were violated: it argues only that his seizure was unconstitutional and that Jones and Ali used excessive force on him.  Compare SAC ¶¶ 38-42, at 6 (Fourth Amendment search claims), with A. Ramirez MSJ at 17-21 (unreasonable seizure argument), and id. at 21-24 (excessive force argument).  Jones and Ali did not violate A. Ramirez' right to be free from unreasonable searches, particularly as it relates to A. Ramirez' person.  Terry authorizes any pat down of A. Ramirez, because officers apprehended him on potentially violent crimes.  See Favela

v. City of Las Cruces ex rel. Las Cruces Police Dep't, 398 F. Supp. 3d 858, 927 (D.N.M. 2019)(Browning, J.)("An officer may conduct a pat-down search of a person's outer clothing if the officer has reasonable suspicion to believe that person is armed and dangerous. . . . Indeed, the 'reasonable suspicion required to justify a pat-down search represents a "minimum level of objective justification."'" (quoting United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007), in turn quoting United States v. Alcaraz-Arellano, 441 F.3d 1252, 1260 (10th Cir. 2006))).  Any search of A. Ramirez' person would be valid as a search-incident-to-arrest.  See Cronick v. Pryor, 99 F.4th 1262, 1272 (10th Cir. 2024)("'[O]fficers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person.'" (quoting Chimel v. California, 395 U.S. 752, 762-63 (1969))).

Any search-right violation predicated on Jones and Ali's unwelcome entry into the Ramirez property fails essentially for the same reasons that the location of A. Ramirez' arrest does not render the arrest unlawful.  The officers did not enter the home's curtilage, and, even if they did, exigent circumstances justified that warrantless entry.  See Section I.C.1-2 supra, at 31-36.

On the property-revivalist, non-Katz model of Fourth Amendment search, the officers' entry into A. Ramirez' property did not effectuate a search, because they did not enter the curtilage, and, even if they did, the entry lacked an information-gathering purpose.  See United States v. Jones, 565 U.S. at 408 n.5 ("Trespass alone does not qualify [as a Constitutional search], but there must be conjoined with that what was present here: an attempt to find something or to obtain information. . . . A trespass on 'houses' or 'effects' . . . is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or [a Katz] invasion of privacy.").  Cf. Morgan Cloud, Property Is Privacy: Locke and Brandeis in the Twenty-First Century, 55 Am. Crim. L. Rev. 37, 67 (2018)("By the second

decade of the twenty-first century, the hegemony of the reasonable expectation of privacy technique was . . . complete . . . . United States v. Jones[, however,] . . . resurrected the trespass doctrine that the Court had cast aside as 'discredited' nearly half a century earlier." (quoting Katz, 389 U.S. at 353)).  Here, no trespass-theory Fourth Amendment search occurred, because, although a trespass, it did not occur on a Constitutionally protected space, i.e., not on the home's curtilage. See Section I.C.1 supra, at 31-34; Florida v. Jardines, 569 U.S. at 6-7 (concluding that "the officers' investigation took place in a constitutionally protected area," because they entered the "the area 'immediately surrounding and associated with the home' -- what our cases call the curtilage – [which is] 'part of the home itself for Fourth Amendment purposes'" (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).  Moreover, even if the Court did conclude that the trespass was on A. Ramirez' protected curtilage, the trespass was not unlicensed on the basis that the officers possessed an information-gathering purpose: the sole purpose of Jones and Ali's entry onto A. Ramirez' land was to apprehend him after he had escaped there from the public road.  Cf. Jones, 565 U.S. at 408 n.5 ("Trespass alone does not qualify [as a Constitutional search], but there must be conjoined with that . . . an attempt to find something or to obtain information. . . . A trespass on 'houses' or 'effects' . . . is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or [a Katz] invasion of privacy.").  Last, even if there was Fourth Amendment search on the basis that the officers' trespass was coupled with a law enforcement purpose -- at least to apprehend A. Ramirez, if not to gain information or evidence about his criminal conduct, cf. United States v. Carloss, 818 F.3d 988, 992 (10th Cir. 2016)("The Fourth Amendment protects against the government's . . . unprivileged trespass on [Constitutionally protected] property . . . for the purpose of conducting a . . . seizure . . . ." (quoting U.S. Const. amend. IV)) -- then any such

warrantless search was justified by exigent circumstances, as noted above, see Section I.C.2 supra at 34-36.  Accordingly, Jones and Ali did not violate A. Ramirez' Fourth Amendment right against unreasonable searches.

Even if A. Ramirez could show that a violation of his Fourth Amendment search rights did occur, he does not demonstrate that such a violation was clearly established.  The Court's independent research identifies no caselaw holding that a Fourth Amendment search violation exists under these circumstances.  Accordingly, even if there were a violation, A. Ramirez cannot show that the law was clearly established that a Fourth Amendment violation occurs under these circumstances at the time he suffered his alleged violation, so Jones and Ali are entitled to qualified immunity.  See Perea v. Baca, 817 F.3d at 1202.  Because Jones and Ali did not violate A. Ramirez' Fourth Amendment seizure or search rights, and because any such violation was not clearly established at the time, they are entitled to summary judgment on A. Ramirez' claims against them on the basis of qualified immunity.

## II.   JONES AND ALI DID NOT VIOLATE S. RAMIREZ' FOURTH AMENDMENT RIGHTS.

Jones and Ali did not violate S. Ramirez' Fourth Amendment rights and any such violation was not clearly established.  Jones and Ali did not seize unconstitutionally S. Ramirez, because they did not detain her in any manner; nor did they unconstitutionally search her, because the only basis for such a conclusion is their entry onto the Ramirez property, which is not unconstitutional for reasons discussed above.  The A. Ramirez MSJ contains no argument how Jones and Ali's conduct violated S. Ramirez' rights: it focuses solely on the violation of A. Ramirez' rights.[14]  The

---

[14]The Court's Order denying the A. Ramirez MSJ, focuses solely on the alleged violations of A. Ramirez' rights, because the A. Ramirez MSJ only contains argument that Jones and Ali violated A. Ramirez' rights, with no argument regarding S. Ramirez' rights.  See Order at 1-11.

unambiguous record evidence -- including S. Ramirez' own testimony -- establishes indisputably that Jones and Ali did not violate S. Ramirez' rights against unreasonable seizure or search, and that any such violation was not clearly established.

### A.    JONES AND ALI DID NOT UNLAWFULLY SEIZE S. RAMIREZ.

Jones and Ali did not violate S. Ramirez Fourth Amendment rights against unreasonable seizure, because their conduct did not constitute a seizure of S. Ramirez.  During Jones and Ali's Terry detention of A. Ramirez, S. Ramirez was not arrested, nor was she Terry detained.  Cf. Romero v. Story, 672 F.3d 880, 885 (10th Cir. 2012)("An arrest, for purposes of the Fourth Amendment, is a seizure, which occurs 'only when, by means of physical force or a show of authority, [an individual's] freedom of movement is restrained.'" (quoting Fogarty v. Gallegos, 523 F.3d 1147, 1155 (10th Cir. 2008))); United States v. Mosley, 743 F.3d 1317, 1328 (10th Cir. 2014)("During 'brief investigatory stops of persons or vehicles that fall short of [a] traditional arrest,' such as Terry stops, 'the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot."'" (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002), in turn quoting United States v. Sokolow, 490 U.S. 1, 7 (1989))); United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017)("A police officer may seize someone either by physical force or a show of authority."); United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)("[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" (quoting California v. Hodari D., 499 U.S. 621, 626 (1991))).  None of these Fourth Amendment seizure conditions obtained: the officers did not

_____

The Jones MSJ and Ali MSJ, however, do argue that they did not violate S. Ramirez' Fourth Amendment rights.

handcuff S. Ramirez or detain her; she was not told she was not free to leave, nor did the officers' conduct in any way indicate she was not free to leave.  The unambiguous lapel footage and her own testimony establishes this conclusion.  While the line between an arrest and a <u>Terry</u> detention can sometimes be unclear, neither occurred in this situation.   Jones and Ali did not seize S. Ramirez, so Jones and Ali did not violate S. Ramirez' rights against unreasonable seizure.

Even if they did seize S. Ramirez and did so unconstitutionally, S. Ramirez points to no clearly established law demonstrating a Fourth Amendment seizure violation lies on such facts as these.  The Court's independent research identifies no applicable caselaw for such a proposition.  Accordingly, even if there were a violation, S. Ramirez cannot show that the law was clearly established that a Fourth Amendment violation occurs under these circumstances at the time she suffered her alleged violation, so Jones and Ali are entitled to qualified immunity.  <u>See</u> <u>Perea v. Baca</u>, 817 F.3d at 1202.

## B.   JONES AND ALI DID NOT UNLAWFULLY SEARCH S. RAMIREZ.

Jones and Ali did not violate S. Ramirez' Fourth Amendment search rights.  The sole basis for an unconstitutional-search conclusion -- Jones and Ali's warrantless entry onto S. Ramirez' property -- fails for the same reasons that A. Ramirez' identical claim fails.  First, Jones and Ali's entry onto the Ramirez' property does not constitute a search: they did not enter the home's curtilage without a warrant, because the Ramirezes manifest no expectation of privacy in a front lawn exposed to the public, <u>see</u> Section I.C.1 <u>supra</u>, at 31-34; Section E <u>supra</u>, at 38-41; on the trespass theory, the officers' entry was not an unlicensed physical intrusion on the basis that the officers possessed an investigatory purpose, so the trespass alone is not a Fourth Amendment search, <u>see</u> Section E <u>supra</u>, at 38-41.  Even if the Court concluded the trespass was a search on the basis that the officers' purpose was to execute A. Ramirez' seizure, <u>see</u> Section E <u>supra</u>, at 38-

41, nevertheless, such a warrantless search of S. Ramirez' property is not unconstitutional, because exigent circumstances justified it.  See Section I.C.2 supra, at 34-36.

Last, even if Jones and Ali's conduct did amount to a constitutional violation of S. Ramirez' Fourth Amendment search rights, the Plaintiffs identify no clearly established law establishing such a violation as to put Jones and Ali on notice of their actions' unconstitutionality. The Court's independent research identifies no caselaw holding that a Fourth Amendment search violation exists under these circumstances. Therefore, Jones and Ali are entitled to qualified immunity.  See Perea v. Baca, 817 F.3d at 1202.  Because Jones and Ali did not violate S. Ramirez' Fourth Amendment seizure or search rights, and because any such violation was not clearly established at the time, they are entitled to summary judgment on A. Ramirez' claims against them on the basis of qualified immunity.

**IT IS ORDERED** that: (i) the Plaintiff's Opposed Motion for and Memorandum in Support of Partial Summary Judgment Against Defendants Jacob Jones and Malik Ali on Unreasonable Seizure and Excessive Force Claims, filed August 14, 2023 (Doc. 54), is denied; Officer Malik Ali's Motion for Summary Judgment on the Basis of Qualified Immunity and for Failure to Provide Factual Support for Plaintiffs' Their Claims and Memorandum in Support, filed October 18, 2023 (Doc. 69), is granted; (iii) the Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity and on Other Grounds and Memorandum in Support, filed October 19, 2023 (Doc. 72), is granted; (iv) Defendant Board of County Commissioners of Sierra County is dismissed with prejudice; (v) the SAC's claim of malicious prosecution liability is dismissed with prejudice; (vi) the Court will prepare an order entering Final Judgment in this case.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Christopher K.P. Cardenas
Robert L. Sharpe, Jr
Cardenas Law Firm LLC
Las Cruces, New Mexico

     *Attorneys for the Plaintiffs*

Daniel J. Macke
Macke Law & Policy, LLC
Albuquerque, New Mexico

     *Attorneys for Defendants Board of County Commissioners of Sierra County and Deputy*
      *Jacob Jones*

Patricia Williams
Natasha Wesenberg
Wiggins, Williams & Wiggins, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Officer Malik Ali*